Filed 6/13/16  In re S.O. CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re S.O. et al., Persons Coming Under the Juvenile Court Law. | |
| TUOLUMNE COUNTY DEPARTMENT OF SOCIAL SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> S.H., <br><br> Defendant and Appellant. | F071404 <br><br> (Super. Ct. Nos. JV7383, JV7384, JV7385, JV7386, JV7387, JV7388) <br><br> **OPINION** |

-ooOoo-

APPEAL from orders of the Superior Court of Tuolumne County.  Donald Segerstrom, Judge.

Carol A. Koenig, under appointment by the Court of Appeal, for Defendant and Appellant.

Sarah Carrillo, County Counsel, Cody M. Nesper, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

S.O. (mother)[1] appeals from the orders entered at the 12-month review hearing, after the juvenile court found that returning mother's six children to her custody would create a substantial risk of detriment to the children and terminated mother's reunification services. Mother contends the evidence was insufficient to support the court's detriment finding and the finding underlying its order terminating reunification services. She also contends the court erred by not proceeding as if the children were Indian children under the applicable rule of court. We reject mother's contentions and affirm the juvenile court's orders.

## FACTS

### *Background*

In October 2013, the Tuolumne County Department of Social Services (the department) initiated dependency proceedings over mother's six minor children, S1, S2, S3, S4, D., and S5, after the department took the children into protective custody following incidents arising from mother's longstanding issues with alcohol abuse and domestic violence. At the time, the children, all girls except for S3, ranged between the ages of two and 14, with S1 being the oldest and S5 the youngest. The department identified J.C. as the presumed father of S2 and S3, and T.H. as the presumed father of D., S4, and S5. J.C.'s presumed father status was later expanded to include S1, whose biological father lived in a different state and had not been significantly involved in the child's life.

In the detention report, the department stated it had received numerous referrals over the years concerning the family and that the department had substantiated two previous referrals alleging general neglect against mother. The department received the

---

[1] In this opinion, certain persons are identified by initials, abbreviated names and/or by status in accordance with our Supreme Court's policy regarding protective nondisclosure. No disrespect is intended.

first of these in January 2009. The January 2009 referral alleged that mother was drinking excessively and neglecting the children. S3 was frequently found wandering the streets and, when he would be returned home, mother would be found "passed out." During the ensuing investigation, mother was placed on a "5150 hold" because she was found to be inflicting injuries on herself. Mother admitted at the time to drinking excessively to cope with various stressors in her life and to leaving the children with different neighbors when she would consume large amounts of alcohol.

The second referral substantiated by the department was received in April 2013. The April 2013 referral alleged that mother was becoming intoxicated on a daily basis to the point of passing out and leaving the children unsupervised. When law enforcement went to investigate, they found mother asleep and called the department for immediate assistance. While still intoxicated and in the children's presence, mother yelled profanities towards the law enforcement and social workers and threatened to kill herself if the children were placed in protective custody.

As a result of the April 2013 referral, mother signed a safety plan and began voluntarily participating in services to address her substance abuse issues. Among other things, the safety plan provided that mother would not consume alcohol while caring for the children. Because mother "adamantly" insisted on a timeframe for reevaluating the safety plan, the department agreed that "six months of services to address her issues with alcohol was a reasonable amount of time so long as she continued to be a sober safe parent following the six months of service participation."

Regarding the circumstances leading to the current dependency proceedings, on September 29, 2013, the department received a report alleging that mother and J.C. had been involved in a domestic violence incident while the children were at home. The incident was witnessed by then 12-year-old S2 and 14-year-old S1, and resulted in S2 calling law enforcement.

3.

On October 1, 2013, a social worker met with mother to talk about the incident of domestic violence on September 29. The social worker reported that mother brought paperwork to the meeting to prove she had attended several Alcoholics Anonymous (AA) meetings and was complying with the safety plan she had signed in April. Mother also told the social worker that, although she had not consumed alcohol in six months, she was planning to drink alcohol on an occasional basis ("like a glass of wine with dinner") when she was not caring for the children. The social worker suggested mother first talk to her children about how they felt about her drinking again. Mother responded by arguing that she just wanted to have an "occasional" drink and that she was not going to become intoxicated. She added that she did not consider herself an "alcoholic" and said she would not allow substances to interfere in her or her children's lives.

After having this conversation with mother on October 1, 2013, the social worker spoke with S2 on October 10, 2013. S2 asked the social worker whether she had told mother it was okay to drink again. When the social worker replied that she had not condoned mother's use of alcohol, S2 reported that on Monday, mother had consumed "four shots" of alcohol and "passed out" and left the younger children in S2's and S1's care. Before mother became intoxicated, mother asked S2 whether she wanted her to drink at home or at a friend's house. S2 told mother that she wanted her to stay home. S2 explained to the social worker that she did not think her mother would drink as much at home or on a school night. S2 was upset about mother's drinking and indicated she wanted to live with her father, J.C.

On October 11, 2013, S2 called the social worker from her school and reported that mother had been drinking alcohol the night before and that they got into a physical altercation after S2 confronted mother about her drinking. According to S2's account of the altercation, mother grabbed and scratched S2's arms as S2 struggled to get away. Mother then followed S2 to her bedroom and attempted to "spank" her. While struggling against mother, S2 hit her head on a jewelry box. S2 also sustained scratches on her legs

4.

as mother pulled her off of the bed. S2 told the social worker that she knew mother had been drinking alcohol because she could smell it on mother's breath and saw the "bottle of vodka half way empty."

After speaking with S2 on October 11, 2013, the social worker and a supervising social worker spoke with mother, who already had a scheduled appointment at the Child Welfare Services (or "CWS") office. Regarding the altercation reported by S2, mother told the social workers that S2 "got in her face" and accused her of lying about the department allowing her to drink and she was offended and got angry when S2 called her an "alcoholic." Mother told the social workers she had spoken with her children first and that they were "fine" with her drinking again. She also pointed out that she had asked S2 first if S2 wanted her to drink at home or at a friend's house and that S2 had asked her to stay home. The social workers advised mother it was not the child's responsibility to make a decision about where mother should drink. Mother started arguing that she should be able to drink if the children were safe and insisted she could have driven them to the emergency room if it had been necessary.

At the end of the meeting with mother on October 11, 2013, the social worker advised mother that her consumption of alcohol was having a negative impact on her children and that she was unable to parent appropriately while under the influence of alcohol. The supervising social worker then advised mother that the children were not currently safe in her care and that the department was placing them in protective custody. Mother remained calm and said that she was a "good parent" and that she could not understand why the department thought the children were not safe.

### *Jurisdiction and Disposition*

When the contested jurisdictional hearing concluded on November 27, 2013, the juvenile court found that mother's six children came within the meaning of Welfare and Institutions Code section 300, subdivisions (b) (failure to protect) and (j) (abuse of sibling), and that S1 also came within the meaning of section 300, subdivision (g) (no

5.

provision for support).[2] Regarding its jurisdictional findings under section 300, subdivisions (b) and (j), the court found the supporting allegations in the first amended dependency petitions, filed on November 4, 2013, to be true, namely:

> "…On September 29, 2013, Tuolumne County Sheriff Department, responded to the residence of [mother] as [S2] called and reported a domestic violence incident. [Mother] and the father, [J.C.], engaged in a physical domestic violence dispute while [mother] was providing care to her children. [Mother] attempted to hit [J.C.] with an axe and shattered the windshield of his car with a shovel. [J.C.] dragged [mother] across the ground where she obtained abrasions to her arms and the right side of her hip.…"

> "…On October 07, 2013, [mother] admitted to resuming her use of alcohol consumption and taking 'four shots of tequila,' then falling asleep rendering her incapable of providing care to her six children.…"

> "…On October 10, 2013, [mother] admitted to taking 'two shots of vodka,' then participated in a physical altercation with [S2] in which [mother] scratched [S2] and threw her on a bed causing her to hit her head on a nightstand while providing care to all six of her children.…"

> "…On April 16, 2013, an allegation of general neglect was substantiated as [mother] was providing care and supervision to her children while under the influence" and "was slurring her words, was swaying and having a difficult time standing, and was yelling profanities at law enforcement."

On January 28, 2014, following the contested dispositional hearing, the juvenile court found that returning the children home would create a substantial danger to their safety and well-being. In support of its finding, the court noted that it found S2's testimony to be "[t]he most convincing evidence" presented, establishing that mother had been fighting with both of the fathers, J.C. and T.H., "on a continuing basis" over the years and that "no matter what happens it keeps replaying itself." The court further found that the children had been "exposed over the course of their young lives to an

---

**2**    All statutory references are to the Welfare and Institutions Code unless otherwise specified.

6.

extraordinary amount of both verbal and physical violence that no child should be exposed to" and that the testimony of mother and the two fathers reflected "a remarkable lack of insight ... particularly a lack of insight as to the effect this violence has on the children." The court observed: "[F]or these parents, it's all about them. I didn't do this. I didn't do this. She did that. It's not about what effect it's had on the kids. It has to do [with] what effect it's had on the parents it seems like." The court concluded it had "absolutely no confidence" that if the children were returned to any of the parents, "that the exact cause of why they were detained in the first place wouldn't reoccur" and expressed the opinion that they would "be back here in really short order ... arguing about the same things."

The court then ordered reunification services for mother and the two fathers. Mother's case plan required her to complete up to two psychological evaluations and to complete a counseling program focused on issues of childhood trauma, posttraumatic stress disorder (PTSD), codependency, domestic violence, and substance abuse. She was also required to complete a parenting education program, to attend three "AA/NA" meetings each week, and to participate in, show progress through, and successfully complete a substance abuse treatment program. The service objectives of mother's case plan included staying sober and showing her ability to live free from alcohol dependency, taking appropriate action to avoid being a victim of further domestic violence, obtaining and maintaining a suitable residence for herself and her children, and not behaving in a manner that was verbally, emotionally, physically, or sexually abusive or threatening.

### Six-month Review

According to the report the department filed in anticipation of the six-month review hearing, although mother had been compliant and was participating in all aspects of her case plan, as well as taking an active role in the "12-step" community, concerns remained regarding her ability to make progress and to make the long-term behavioral changes necessary to parent the children safely. Despite her well-documented history of

7.

struggling with substance abuse issues, mother continued to minimize her past use of alcohol while caring for her children. Mother maintained that alcohol was not a problem for her and that it was appropriate when she was drinking and became intoxicated to leave the younger children in the care of S1. The department opined that mother's inability to recognize the inappropriateness of her behavior indicated she was at risk for resuming her problematic use of alcohol in the future.

The department further reported that mother continued to blame the two fathers for the volatile relationships she maintained with them. The department noted that, after the children were removed, mother and T.H. had "reengaged in a romantic relationship" and appeared "committed to making their relationship work." The couple had also voluntarily participated in a domestic violence program together. However, while mother's alcohol use was at the root of many of their disagreements, mother maintained that T.H.'s anger towards her was based not on her use of alcohol but on his desire to control her and not be required to care for the children by himself.

The department further reported that mother had completed a psychological evaluation that determined mother did not have the ability to benefit from services or to make the changes necessary to provide a safe and adequate home for the children in the next six to twelve months. Therefore, the department concluded, mother would "need to show a great amount of improvement in her ability to be open to behavior changes" and "to demonstrate insight into her substance abuse and relationship issues, and gain appropriate coping mechanisms and parenting skills."

When the contested six-month review hearing concluded on July 30, 2014, the juvenile court continued the children in out-of-home placement and articulated specific concerns it had regarding mother's statements and testimony, which the court explained failed to provide the court with sufficient assurance that the children could be returned home safely. The court noted that mother continued to maintain that "whatever [S2]

8.

said" to the department was the reason for the children's removal. The court admonished mother:

> "That wasn't the reason for their removal … I've heard two trials. [¶] I heard the domestic violence restraining order application that you made. I also heard the jurisdictional hearing and the dispositional hearing with the physical altercation between you and [J.C.] I heard extensive testimony about that. I heard it from the children. I heard it from you. I heard it from [J.C.] There's not much that [S2] could have said that would have affected the decision to detain these children."

The juvenile court further observed that mother's statements created the impression that whenever somebody disagreed with mother, they were "automatically wrong" in her view. The court noted: "You … said I started reading the report, six-month review report. It really hurt my feelings, until I didn't like where it was going. It was a downer to me. I stopped reading. And the psychological evaluation same thing." The court observed that mother seemed to want to "control" what the department did and to "dictate" how well she was doing in the program. The court continued: "That's not the way it works, you know. You're—the purpose of being in the program is for you to see the impact of what your behavior in the past has done to your kids and the damage that it's caused, and how to avoid it happening in the future." The court concluded by advising mother:

> "I want more assurance. I want to see that you make additional progress in the treatment program, learn to stop blaming other people, learn to take ownership of what you've done and your part in it and recognize that you don't get to call all the shots, and ... that when the social worker tells you something, you need to listen to it and not just reject it because you disagree with it."

After ordering reunification services to be continued for mother and the two fathers, the juvenile court set a 12-month review for November 18, 2014.

*Twelve-month Review Hearing*

In the original 12-month review report prepared in November 2014, the department recommended terminating mother's and T.H.'s reunification services and setting a section 366.26 hearing to determine a permanent plan of care for their children, S4, D., and S5. The department also recommended that the paternity status of J.C., with whom S2 and S3 had been placed, be raised to presumed father for S1, and that J.C. be ordered to sign and comply with a family maintenance case plan for S1.

In summarizing the reasons for its recommendations concerning mother, the department explained that, despite mother's active participation in the 12-step community and participation in all the required services offered to address her mental health and substance abuse issues and pattern of engaging in unhealthy relationships, mother had failed to make sufficient progress, and did not have the ability to make the significant progress necessary, to be able to provide a safe environment for the children. The department noted that this had been the conclusion of two psychological evaluations mother had participated in during the previous six months.

The department opined that mother's insufficient progress was demonstrated by her persistent refusal or inability to take responsibility for her role in placing the children's safety at risk and her failure to fully acknowledge the negative effects that her use of alcohol had had on the children. For example, mother blamed the department for the children's removal by repeatedly making statements that the department, during its investigation of one of the recent referrals, should have specifically directed her not to drink alcohol and, had it done so, she would not have had the children removed from her care.

Mother also rationalized her past behavior by claiming she did not drink excessively and estimating she only went out for drinks with girlfriends once a month. This conflicted with the fact that she had exposed her children to her excessive alcohol use when she became intoxicated and passed out at home. Another way mother

10.

rationalized her behavior was by stating a responsible adult was always watching the children. But she ignored the negative impact it had on her children to see her intoxicated and passed out at home. Mother's only explanation for how her alcohol use had traumatized her children was to say that it had exposed them to the angry reactions of T.H. and that T.H.'s yelling was what had been harmful to them.

Mother also persisted in blaming S2 for, and in denying that she had harmed S2 during, their altercation on October 10, 2013. Mother had also said numerous times that the children were taken away from her because of S2's statements to the department and that S2's statements were exaggerated and motivated by her desire to live with J.C. Mother completely ignored how her alcohol use affected S2 and caused the child to become extremely upset when she saw mother drinking.

In addition, mother persisted in failing to take responsibility for her role in exposing the children to unhealthy and harmful relationships. The department noted that, although she was not responsible for the fathers' actions, mother was responsible for continuing to engage in unhealthy relationships with them over the years and the impact that had on the children. Although it was positive that she and T.H. had worked on their own relationship issues, mother's anger towards J.C. had intensified since their children were returned to his care and she continued to engage in conflicts with him. Mother often referred to J.C. as her "rapist" and "abuser" and showed no signs of taking any responsibility for continuing to allow him around her children during their abusive past.

The department concluded that mother continued to place blame on S2 and the two fathers for the reasons leading to the children's removal from her custody, ignoring the fact that, historically, the department had consistently received reports regarding mother's ongoing substance abuse and mental health issues which had impacted the family. Without taking responsibility for her own behavior and for exposing the children to her substance abuse, mental health issues, and domestic violence, the department opined, mother had no reason not to resume her past behaviors in the future and thereby

11.

place her children at risk if they were returned to her care. Mother's consistent defensiveness regarding her behavior had greatly impeded her ability to benefit from services. In order to make necessary behavioral changes, mother needed to be able to acknowledge her problem behaviors. Mother, however, continued to deny her own shortcomings, rationalize her behaviors, and lack the insight necessary in her situation to safely parent the children.

The 12-month review hearing, originally set in November 2014, was continued to late January 2015. In the meantime, the department filed an addendum report reflecting that on December 19, 2014, mother and T.H. both "posted inappropriate material regarding their active Juvenile Court case on the social networking website, Facebook." Specifically, mother posted the following statement on her personal Facebook page:

> "Anyone who could help our family please repost cws is legally kidnapping children in toulumne county please contact [T.H] @Yahoo.com thankfully [H.]/[O.] family please share so we won't have any more family's torn apart!"

The post included a picture of the children holding a sign which read: "All we want 4 Christmas is to go home!!!"[3]

In the comments section of her Facebook post, mother wrote the following in response to a comment asking why the children were removed from the home:

---

**3**    T.H. included the same picture on his personal Facebook page in a post that read: "Our children have been in child welfare services custody for over a year. My wife and I have gone above and beyond what they have asked us to do to get our children back and now there trying to keep them permanently. Tuolumne county is kidnapping children every day and nobody is doing anything about it!!!!! I even had a visit supervisor tell my wife that she got into this career to help children, but after the things she's seen in tuolumne county child welfare service social workers in the last few Months she's considering a new career because there doing things that are not right. We are asking everyone who see's this post to repost so someone who can help us will possibly see it, and help me expose tuolumne county CWS for traumatizing children and tearing families apart. [T.H.] contact info-[T.H.]@yahoo.com. PLEASE HELP!!!!!!!!! THANK YOU THE [H.]/[O.] FAMILY."

12.

"Keeps changing they won't say. My rapist called cws on me every year since 2005 then I got married to another man not him this was his revenge on me for leaving him and his abuse on me And my children now he has two of them! & Trying to get a third!"

In response to another comment asserting that child welfare was taking children from loving parents, mother wrote: "I know! Did more than required still Trying to adopt them out! Court's jan 22 2015."

On December 22, 2014, the social worker called mother and advised her that the Facebook post violated juvenile court orders not to disclose or distribute confidential materials relating to the case and directed mother to remove the post immediately. The social worker further advised mother that because the picture of the children had been taken during a supervised visit, the department had to move the visits back to the Child Welfare Services office to provide for better supervision. In addition, the social worker told mother the family would not be able to get the planned two-hour extension for their holiday visit because the Child Welfare Services office did not have the ability to accommodate a four-hour, onsite visit with six children.

During the phone conversation with the social worker, mother became argumentative and disagreed with the social worker's statement that posting anything regarding the case and the children returning home was confidential information. She also disagreed with the social worker's statement that having the children pose for the picture was completely inappropriate and potentially damaging to them. When the social worker directed her to take down the post, mother claimed she did not know how to delete it. After the social worker advised mother she was required to appear in court for an order to show cause (OSC) hearing regarding the post, mother hung up the phone.

Later the same day, mother called the social worker back and complained it was unfair the department was taking away two hours from her four-hour supervised visit with the children. The social worker explained that the parents were not entitled to the extra visiting time because it was not based on a court order, but that the department had

13.

offered the extra time because the family was not going to be able to spend the holidays together. However, due to the parents' inappropriate behavior during the last visit, the supervised visits now needed to be moved back onsite where the department was unable to accommodate a four-hour visit with six children. When mother continued arguing with the social worker about the visitation schedule, the social worker reiterated that a longer visit could not be accommodated onsite and reminded mother of the OSC hearing she was required to attend.

After speaking with the social worker the second time, mother reposted the inappropriate post multiple times on Facebook, adding:

> "Do to these posts of our children's wanting to come home they've taken 2 of our 4 hr Christmas visit from our kids! Thanks so much toulumne county cws we really appreciate your heart felt intentions! This is our family there sign posted was told to b taken down because we wanted the people to know what they wanted!"

On December 23, 2014, the social worker spoke with T.H. and communicated the same information she had communicated to mother regarding his Facebook post. T.H. said he understood and requested that all further communication be through his attorney.

On December 30, 2014, mother and T.H. both appeared at the OSC hearing, where the court ordered them both to immediately remove the inappropriate Facebook posts.

In another addendum report filed in February 2015, the department reported that, upon further discussion with T.H.'s service providers, the department was changing its recommendation from terminating his reunification services to continuing services. The department noted that T.H. had participated in all his required services throughout the dependency proceedings and, despite problem behaviors he initially exhibited, he had recently demonstrated moderate progress in areas of communication and anger management and had presented as calm, collected, and appropriate, even when discussing highly emotional subjects including not reunifying with the children. His psychological evaluation had also concluded that he had the potential to benefit from services.

14.

The department cautioned that T.H.'s ability to benefit from services was strictly contingent on his ability to develop increased insight into his role and responsibility as a parent, particularly in regards to his relationship decisions respecting mother. The department opined that continuing contact between T.H. and mother would be detrimental to their three children together and therefore recommended that T.H. be offered additionally services specifically addressing issues of codependency, insight into his behavior, and gaining independence from mother.

The department acknowledged its recommendation placed T.H. in a difficult position because he appeared committed to his relationship with mother. However, it was ultimately his responsibility as a parent to provide his children with a safe, loving, and stable environment. Therefore, the department was asking T.H. to make the difficult decision to place the children's safety and well-being before his relationship with mother, who continued to demonstrate poor judgment and lack of ability to protect her children as most recently evidenced by her actions and comments on Facebook.

The department pointed out that, in addition to mother's own display of resistance and lack of insight into her behavior, there were currently two psychological evaluations concluding she could not benefit from continuing services to become a safe parent for the children. In light of the minimal progress mother had demonstrated in alleviating the issues that had brought the family to the juvenile court's attention, the department concluded it was not in the children's best interests to extend services to mother, even though it was recommending additional services for T.H.

The 12-month review hearing was conducted over three days between January 22 and February 11, 2015.

Janet Johnson, a program manager with Infant Child Enrichment Services (ICES), testified regarding her observations of several of mother's and T.H.'s supervised visits with the children and the parenting support she gave mother and T.H. by talking to them on the phone and during in-person meetings. Johnson testified her current concern

15.

regarding mother's parenting abilities was with her being able to stay "regulated." Johnson explained: "Regulated means that you're in a state of calm and you can think clearly. Regulated would be calm enough to rationally think things out."

Johnson opined that mother's dysregulated state made it difficult for her to engage fully in services Johnson provided. Johnson explained: "The focus would be on [mother's] upset. It would be on her anger towards how things were not going—that she's jumped through all the hoops and now they still haven't given my kids back." Although Johnson thought mother understood the tools she had tried to teach mother for improving communication skills, mother had not been effectively implementing those tools in the supervised visitation setting and would often need to be reminded to relax and calm down. During some of the early supervised visits she observed, Johnson noted that mother would become agitated when one of the children would not want to eat food mother and T.H. had brought for the children. Johnson observed "there was a lot of blaming" with mother making comments complaining about how she had made food and the foster parents had let the children have food before the visits.

Johnson observed that the children could see mother's anger when she would complain about Child Welfare Services and the foster parents in their presence. On the occasions when mother did this, which was not at every visit Johnson observed, she would warn mother that the children heard things and she needed to be careful what she said. Despite being warned and discouraged, mother continued to make similar comments in front of the children. Johnson opined it was hard for mother to follow Johnson's instructions about self-regulation. Johnson observed that mother exhibited "continuous blaming and … continuous anger and stress symptoms" throughout the period they worked together.

The last time Johnson saw mother was around the end of October 2014. At that time, Johnson did not think mother had yet demonstrated significant progress in reaching

16.

the goals on which they had been working. Johnson did not expect that with reasonable services mother would be able to become a suitable parent by mid-May of 2015.

Dr. Blake Carmichael, a staff psychologist and evaluation program manager with the Children's Hospital of University of California, Davis, performed the first psychological evaluation of mother in April 2014, after receiving a referral from the department during the six-month review period. The parties stipulated that Dr. Carmichael was an expert as a forensic psychologist in the area of children and families.

In his testimony, Dr. Carmichael described in detail how he conducted the psychological evaluation, including reviewing pertinent court documents, administering psychological tests to mother, interviewing mother along with one of his colleagues, conducting clinical consultations with the social worker and other service providers who had worked with mother, and interviewing mother's own mother and one of mother's close friends.

Dr. Carmichael's testimony regarding the findings of specific psychological tests he administered to mother generally reflected that mother was currently experiencing a number of psychological symptoms, including trauma symptoms, which were causing problems for her but which she was unwilling to endorse. The unwillingness to endorse certain symptoms indicated mother had difficulty tolerating the symptoms or was failing to appreciate the impact they were having on her ability to function. Regarding how such difficulty tolerating symptoms could impact a person's ability to parent, Dr. Carmichael testified:

> "[C]onfronted with stressors as we all would expect of a parent, if you're unable to tolerate symptoms as they occur, if you're easily triggered by symptoms or situations that bring on your symptoms and your tendency is to dismiss or ignore things, that would, once again, have a problem for your own functioning in taking care of your own personal well-being and then being attentive to someone else's needs, particularly a vulnerable or young child."

17.

Dr. Carmichael testified that mother's responses to a psychological test called the "Substance Abuse Subtle Screening Inventory" showed that, while she was not aware of or not acknowledging alcohol was a problem for her, she was nonetheless "endorsing symptoms and situations that are commonly reported by those who have documented histories of substance abuse problems." Regarding what mother's responses revealed in terms of how she perceived the impact of alcohol on her life, Dr. Carmichael testified: "[Mother] was very consistent with her interview statements; the statements she made in the documents we reviewed and that it was not something she felt was a problem." Regarding the implications of the test's findings, Dr. Carmichael opined:

> "Well, at that time, [mother] had been involved in drug and alcohol specific services for at least a year, if not longer. And so when a person is in services that directly address those issues and having ongoing problems with a particular substance such as alcohol, in this case, and still maintaining [that] it isn't a problem or a significant problem, that would be concerning about her use of or benefit from those services. [¶] …[A] lack of awareness or an appreciation for the impact it has on one's own functioning makes them less likely to make changes so that they could be more attentive and responsive as a parent."

Another psychological test administered to mother was the "Child Abuse Potential Inventory." Dr. Carmichael explained that mother's high score on the validity scale included in the test indicated she was "not endorsing problems or situations that typically people would admit to." Regarding the overall findings of the test, Dr. Carmichael testified:

> "So despite [mother's] defensiveness or that approach to the measure, the Child Abuse Potential score was still high or elevated. That's concerning given that you're putting on a good front and you still have elevations on the overall abuse scale, that's a concern. [¶] But there are also elevations on the problems with the family subscale. So recognizing that there's a lot of family conflict, verbal or physical, and then also problems with self or a child, meaning I'm having a difficulty with myself or my kids are having difficulty, what that tells you is a lot of those things contribute to child abuse potential."

18.

Dr. Carmichael confirmed that mother's elevations on the test and "the inability to address those issues absolutely would cause some concern with someone's parenting ability at that time."

During the clinical interview portion of the psychological evaluation, mother told Dr. Carmichael that the last time she had a drink of alcohol was around September 2013 or so, and that she stopped drinking because child protective services told her not to. Dr. Carmichael opined that mother was at a high risk of relapse, explaining:

> "I believe that there's a high risk for relapse for a number of reasons. One, being the lack of insight or appreciation for the difficulty that drinking presented. There was also services in place to help bring a person to get that appreciation. [¶] I seem to recall a time in April of 2013 that there was some diversion program or something in place and it was suggested that it be in place for about a year. There was an argument about wanting that to be accelerated to six months so she was able to discontinue drinking for those six months. However, right after that, she, again, started drinking and led to the current case. [¶] There's always a concern when a person's motivation to stop drink[ing] is to have the children returned. The thinking being that once the children are returned, what is there to keep a person from falling back into those habits when people are making comments that we heard. That caused us great concern."

In describing the clinical consultations that were part of the psychological evaluation, Dr. Carmichael testified that a peer counselor who had worked with mother in 2013, shared her "concerns that [mother] struggled to translate some awareness into practice or kind of follow through with appreciating and taking active steps to avoid problems with alcohol in the future." The fact mother had already worked on the same issue with other counselors in the past was concerning to Dr. Carmichael. The psychologist explained:

> "[I]t calls into question a person's ability to benefit from those targeted services. Certainly you would expect a person who is engaged in those services and admittedly is going to those services to start changing their perspective about their alcohol use and things they need to do to address it. That did not seem to be the case for [mother] given that she has been

19.

involved with those services for approximately a year up to the point that I saw her."

Dr. Carmichael further testified that he diagnosed mother—whose early family history included domestic violence, physical abuse, and sexual abuse—with three diagnoses: panic disorder, PTSD, and adjustment disorder. Although people with these diagnoses were not, as a general matter, precluded from being suitable parents, Dr. Carmichael opined that mother's ability to be attentive and responsive to her children's needs was negatively affected by her persistent unawareness of, or unwillingness to recognize, the fact her alcohol use had impaired her relationships, and her attempts to avoid or suppress trauma symptoms she clearly still endorsed.

When asked to explain his conclusion that mother was not capable of benefiting from further reunification services within the next six to 12 months, Dr. Carmichael testified:

> "The diagnoses that we gave and the condition that she is in is certainly treatable. But given the fact that she had been involved in reasonable services to address a number of those issues, but had shown no or limited progress for about a year, calls into question the person's ability to continue benefiting even if they remain engaged in services. That was really the foundation for that opinion. Yes, this is treatable. But if you're looking at this time frame, we did not believe that was going to be the case."

When asked what level of progress he would expect to see from an individual who had engaged in the services documented in mother's records, Dr. Carmichael testified that "having a better appreciation for the fact that alcohol was impacting family functioning and her behaviors, that would be an example of something you'd like to see even long before a year's long services."

Dr. Carmichael noted that mother presented as energetic and likable and never became combative or aggressively argumentative during the clinical interview. However, when mother was asked "more confrontational questions, she started talking about another person and why it was their problem or why they were kind [of] blaming her

20.

which was pretty consistent with the testing from the PAI [(i.e., Personality Assessment Inventory)] and the relationship conversations we had."

Dr. Carmichael confirmed that, in late summer or early fall, mother contacted him and expressed concern that his evaluation had made her out to look like she was a bad person or a bad parent. Mother also offered to send information to Dr. Carmichael to review to see if it would change his opinion. While Dr. Carmichael did accept and review the information mother sent him, it did not change the overall nature of his opinion.

Dr. Carmichael further testified that it would not change his opinion regarding mother's inability to benefit from services in the next six or 12 months were he to learn from her individual therapist that after roughly three months of therapy, she had begun to exhibit some improvement, like calming down and appearing more receptive to treatment. In this regard, Dr. Carmichael testified: "It's encouraging, but I would not say that alone kind of hanging in the balance and what we also know leading up to that point would be sufficient for me to change that opinion."

Dr. Deborah Schmidt, a licensed psychologist, conducted the second psychological evaluation of mother in October 2014, after receiving a referral from the department during the 12-month review period. Dr. Schmidt testified the referral asked her to assess mother's psychological state to determine if mother was a safe parent or possessed the capacity to become one within the next six or 12 months if she participated in services. The parties stipulated that Dr. Schmidt, like Dr. Carmichael, was an expert in this area.

In addition to describing the reports and records she reviewed in conducting mother's psychological evaluation, Dr. Schmidt testified that the entire evaluation lasted six hours and seven minutes. The clinical interview component of the evaluation lasted four hours and 15 minutes. The remainder of the time was spent on psychological testing.

In characterizing her use of alcohol, mother told Dr. Schmidt that she had been "told" she was a "binge drinker." Although mother described drinking to the point of passing out a number of times, Dr. Schmidt testified that mother did not "really believe" that she was an alcoholic because she "felt like she could drink or not drink." Dr. Schmidt further testified: "She minimized the extent to which her alcohol consumption affected her parenting. She said that most of the time she had another adult present when she was drinking and so she felt like that didn't affect her parenting ability."

Dr. Schmidt opined that the presence of another adult would not necessarily alleviate the negative impact mother's drinking had on the children, explaining:

> "[F]or a parent to drink to the point of intoxication in front of their children can impact the children in a number of ways depending on how the parents behaved. If they said things they didn't mean or passed out and became belligerent, the children don't know what's going to happen. If there was any yelling, screaming or conflict, that could exacerbate any anxiety and ultimately end up resulting in trauma."

Regarding mother's use of marijuana, a drug for which mother had a medical recommendation for anxiety, Dr. Schmidt opined that mother had a cannabis dependence disorder. Dr. Schmidt believed that in using marijuana on a nightly basis, mother was "substituting one drug for another." Dr. Schmidt further opined that marijuana could impair mother's ability to parent in a number of ways, including by leading to irritability, exacerbating psychiatric symptoms, and affecting judgment and decisionmaking.

Dr. Schmidt testified her main concern was that mother exhibited a pervasive denial regarding "how her substance abuse had been problematic and resulted in her children being removed." Dr. Schmidt observed that "[e]ven after participating in services for months," mother had not reached "the point where she could take responsibility for her behavior and point out how she was going to change things."

Regarding how mother characterized the reasons for the children's removal, Dr. Schmidt testified that mother had told her that "they were taken away because her daughter reported that she had been abusive to her when she was at school" and that mother "blamed her daughter for exaggerating the situation." Dr. Schmidt further testified that mother did not think the department's intervention was necessary nor did she take any responsibility for the intervention. Although mother was cooperative during the interview, Dr. Schmidt observed that mother's "affect tended to switch from being appropriate to very defensive and angry depending upon what the topic was."

One of the psychological tests Dr. Schmidt administered to mother was the "Parental Awareness Skills Survey." It was comprised of a structured interview presenting parents with a variety of situations that parents commonly encounter with their children and asking them how they would handle those situations. Mother's results on this test indicated "she lacked an awareness of the critical issues underlying the situations." Dr. Schmidt explained that "[mother] could come up with a solution to deal with a certain behavior, but she had trouble understanding why the child was acting that way in the beginning and did not ask questions to try to determine what was really going on." Asked what impact this could have on mother's ability to parent, Dr. Schmidt testified: "Reacting to the behavior with punishment without trying to figure out what was really going on to deal with the underlying problem or the underlying issue."

Dr. Schmidt further testified that mother also had significant elevations on the validity scale measuring whether someone was endorsing a significant number of unusual psychological symptoms. In this regard, mother obtained significant elevations on the paranoid, schizophrenic, psychopathic, deviate, and hypochondriasis scales. Regarding the symptoms connected with these scores, Dr. Schmidt testified:

> "Well, the paranoia and schizophrenic scales were the highest elevated suggesting she endorsed being suspicious of others. Individuals with similar elevations tend to misinterpret the behaviors of others. They feel like they may be treated poorly and they are being discriminated against.

23.

They blame others for their problems. They often feel like they are getting a raw deal out of life. They have trouble trusting others. At times, they may become delusional and psychotic because those elevations were at those levels. They tend to be anxious and fearful and uncomfortable around others."

Mother's elevation on the combined psychopathic/deviate scale corresponded with a tendency to be "chronically angry, hostile, agitated, and may act out in a variety of ways."

Regarding how these symptoms could impact mother's ability to benefit from further services, Dr. Schmidt testified that mother's elevations were suggestive of a person who would have trouble trusting others and who would be suspicious of them. In mother's case, she had shown difficulty accepting feedback and recommendations made by various service providers. Mother tended to blame others for her troubles and problems and to rationalize her own behavior, which was consistent with her test results. Dr. Schmidt explained that, in order to profit from services and treatment, rather than just rejecting what people tell you about your behavior, you need to be able to consider what people were telling you about your behavior and figure out how to apply it to correct your behavior in your everyday life.

Based on her overall assessment, Dr. Schmidt opined that mother had PTSD, a Generalized Anxiety Disorder, Polysubstance Dependence Disorder in remission, and an active Cannabis Dependence Disorder. Although people with these diagnoses were not necessarily precluded from being suitable parents, in mother's case, they negatively affected her ability to parent. Dr. Schmidt explained that mother had experienced early childhood trauma, during which she was repeatedly exposed to conflict and violence. She never developed the coping mechanisms she needed to deal with the anxiety that resulted from trauma because she started using drugs and alcohol and abusing herself at a very early age. Mother had also had poor coping skills modeled for her. Consequently, Dr. Schmidt opined that mother had trouble modulating her emotions and anxiety when

24.

she felt threatened or was in a conflictual situation and tended instead to abuse substances and act out in various ways. Mother described using many different substances over the years, including alcohol, cocaine, and methamphetamine. More recently when the children were detained, mother was not only taking prescription opiates but was mixing it with alcohol and marijuana, which resulted in her parenting abilities becoming impaired.

Dr. Schmidt opined that mother's lack of coping skills placed her at risk for engaging in conflict with others, including significant others, service providers, and her children. Dr. Schmidt explained that when mother perceived herself to be threatened in any way, she tended to react emotionally without thinking about what she is doing. Dr. Schmidt noted that the delivered service log of the social worker reflected this was something mother had repeatedly done during visits with the children, and it was also apparent in the very unhealthy relationships she had with J.C. and T.H., where conflict was ongoing.

Dr. Schmidt further opined that her concerns would not be alleviated were she to learn that mother had maintained her sobriety with respect to alcohol for a year. Rather, she would continue to think mother had "a fairly significant risk for relapse." Asked to explain the bases of her conclusion that mother was unlikely to benefit from further reunification services within the next six to 12 months, Dr. Schmidt's testified:

> "She's been participating in services for a number of months, but yet, as I said before, when I saw her, she was continuing to smoke the marijuana.

> "In reading the delivered service logs, she was continuing to exhibit conflict with service providers, her children, her significant others and other individuals. [¶] … [¶]

> "When I evaluated her, she—she had difficulty understanding how she was responsible for her children being placed in protective custody and tended to blame others, including her significant others in various circumstances.

"She didn't take responsibility that her substance abuse or the conflict she engaged in in front of her children had a negative impact and/or traumatized them.  And one would have thought she'd be able to gain some kind of insight into that after receiving multiple services, but she has not."

Asked what level of progress she would have expected given the services mother had received, Dr. Schmidt testified:

"That she would, first of all, accept that her behavior had been influential in her children being removed from her care and her substance abuse was a problem rather than minimizing the extent that it was a problem.  She played a role in engaging in the conflict with her significant others which traumatized her children."

Asked whether it would change her opinion to learn that mother's individual therapist had stated that, after roughly eight sessions, mother began to exhibit some receptiveness to treatment and calming of her demeanor, Dr. Schmidt testified:  "I don't think it would change my opinion, no; not after reading the delivered service log.  [¶]  I believe it was on October 24, she had conflictual interactions with her daughter, the supervisor, [J.C.], and [T.H.] in front of her children."

Asked what mother's recent actions of posting on Facebook, photographs taken during a supervised visit of the children holding up a sign saying they wanted to go home, along with comments about Child Welfare Services kidnapping children, suggested about mother's progress, Dr. Schmidt opined:  "That she, again, was not taking responsibility for her behavior and blaming others for the situation she's created."

Social worker Emily Flosi, who was assigned to mother's case, testified about a meeting on October 31, 2014, that had been requested by Josh Tracy, a therapist who had recently been assigned to provide counseling services to mother.  Topics discussed at the meeting included mother's defensiveness and lack of insight in taking responsibility for her actions, gaining appropriate communication skills with both her children and adults, as well as the concerns brought up through her psychological evaluation through University of California, Davis.  Throughout the meeting, mother was argumentative and

continued to be defensive about the department's concerns. Since that meeting, Flosi had not seen any progress in mother, although Tracy had reported to her that, during mother's most recent appointment with him, she had seemed more receptive and open to taking responsibility.

Regarding supervised visits, Flosi testified that mother often made negative comments about the social workers and foster parents to the children. For example, when two other social workers took S1 and S2 out to eat before a visit in order to talk to and spend time with them, mother became very angry with the department and the social workers because the children were not hungry to eat the food mother had brought to the visit. Mother became so agitated, a supervisor was required to come in and direct mother not to speak about the incident during the visit and to spend time with the children instead of arguing and making negative comments about the social workers.

Mother also engaged in conflicts with S2 during some of the supervised visits. Flosi explained that there had been "multiple issues with cell phones" where social workers had to intervene because of conflict that would arise when mother would take away S2's cell phone, for which her father paid.

Regarding mother's inappropriate Facebook postings by mother and T.H., Flosi testified they constituted a breach of confidentiality during the supervised visit on December 19, 2014, during which the children posed for a picture with a sign saying all they wanted for Christmas was to go home. Flosi confirmed the Facebook posts were public and that mother and T.H. had made comments encouraging others to share the posts. When Flosi tried to speak with S1 and S2 about the picture, they were reluctant to talk about it or go into detail. They simply said they had made a sign and posed for the picture.

Flosi opined that mother's comments on Facebook regarding why the department removed the children ("keeps changing … they still won't say") showed that mother still had not gained any insight. When Flosi talked to mother about the Facebook post,

27.

mother said she did not understand why it was inappropriate and was not receptive to Flosi's attempts to explain but became argumentative instead.

Flosi concluded that, although mother had participated in all the required services in her case plan, her behavior itself had not changed. Mother was still very defensive about her role in the children's removal and not taking responsibility for her actions. Mother continued to have a lot of difficulty regulating her own emotions and being able to have a conversation about these issues. Flosi opined that such resistance and defensiveness made it difficult to engage in and get something out of services. Given that mother had been participating in reunification services for the past year and voluntary services for several months before that and still showed no progress or gain in insight, Flosi did not think there was a substantial probability that by the 18-month review hearing mother would make "all of that progress in that short amount of time."

Mother called a number of witnesses on her behalf. S1 testified that living with her foster parents was emotionally difficult and she would prefer to return to her parents, starting with mother. S1 felt safe around mother and did not have to worry about getting judged. S1 also wanted more frequent visits with mother and for visits to occur in a more home-like setting or in a park or other public place. Although they had visits at a park a few times, the visits had moved back to the social services office.

During the 15 to 16 months she had been in foster care, S1 had noticed changes in mother and believed that mother had become better at communicating with the children and was able to handle more. S1 thought mother had made progress in dealing with stress and had observed mother calm herself when she started getting stressed by taking a moment to breathe. Mother was also better at remaining patient. S1 felt safe with mother and thought mother was improving and making steady progress. S1 testified she did not believe mother would start drinking again if S1 went home "because I feel this time she actually understands what drinking could do to the family."

28.

On cross-examination, S1 acknowledged having witnessed mother intoxicated on numerous occasions. However, she did not feel afraid or worry too much about something horrible happening because mother always had someone around her who was sober. When asked about her understanding of the reasons for the department's involvement with her family, S1 testified, "I believe it was the domestic violence that cause most of [it] and my mom's habit of drinking."

S1 also testified that there was tension between mother and S2 during supervised visits and that she would step in to defend S2, when S2 would get into an argument with mother. S1 believed there was only tension between mother and S2, and not between mother and any of the other siblings, explaining, "I feel like [mother] blames [S2] for being in the situation and then it just starts from there. If my mom says something, I'll tell her that it's not [S2's] fault." S1 confirmed she felt like her role with mother and S2 was that of "peacemaker."

Regarding the Facebook picture, in which S1 was the one holding up the sign about wanting to go home for Christmas, S1 testified that mother had asked her if she wanted to hold the sign and she had said "sure." S1 felt like what the sign said was true. She did not know what they were going to do with the picture or who posted it on Facebook.

Mother's friend, Jacquelyn, who had known mother since childhood, testified that mother was like a sister to her and she trusted mother with her own children. Jacquelyn did not think mother was a problem drinker. When mother would occasionally use alcohol, she always made arrangements to make sure someone was watching the children.

Jacquelyn testified that she had noticed positive changes in mother's ability to cope with stress, explaining: "[W]ith all the parenting classes, the anger management and all the meetings that she's attended, there's just a serenity and peace within her or a calmness to handle things that are coming up in her life." Jacquelyn described mother as having a positive attitude and being confident and determined to get the children back.

29.

M.N., mother's 20-year-old son, who had been living with mother and T.H. since July 2014, and lived with her for a time when he was in high school, testified that mother was a great parent and that he had never observed her drinking too much. M.N. further testified that mother was a responsible person and, every time she would drink, she would leave the home and go out with friends and she would always make sure there was somebody to take care of the children.

When asked about changes he had observed in mother since coming to live with her, M.N. testified that mother had quit drinking and smoking, and she had developed better communication skills with T.H. and there was less fighting and arguing between them. M.N. thought mother's attitude towards the department had improved and characterized it as "respectful." She was determined to do what was necessary to get the children back and was always upbeat and outgoing about her counseling and meetings. M.N. had no fears about his siblings being returned to her care.

When questioned about his understanding of what had led to the dependency proceedings, M.N. testified: "As far as I know, my sister had an altercation with my mom and she had said that my mom abused her and that's what led to the kids being taken away." M.N. was not aware that mother's use of alcohol was a factor in the case.

Four individuals who knew mother from her participation in AA and Al-Anon testified regarding their positive impressions of mother's participation in those 12-step programs. One witness, who knew mother from AA, testified that mother went "from being shy and reticent to participating in groups and getting into what we call service helping others." Another witness from AA described mother and T.H. as having become "pillars of the 12-step community."

The third witness, who knew mother from Al-Anon, testified that mother was a "different person" from when she started and had become more emotionally stable and able to handle day-to-day problems without becoming angry or blowing up. Regarding the reasons for why mother was participating in Al-Anon, the witness testified he only

30.

knew what mother shared at meetings, and he recalled her sharing that she was a member of another 12-step program, and she wanted help from Al-Anon too because she had "grown up in the disease with everybody around her in the disease." He also recalled mother sharing that the children had been taken away and that she was in pain and really wanted them back. But he did not recall her ever mentioning that domestic violence had been involved.

The fourth witness testified that she had known mother "not quite a year" and was mother's AA sponsor. Mother seemed sincere in her efforts to succeed in the program and had not been resistant to any of the sponsor's suggestions. Mother's sponsor further testified that mother and T.H. came over to her home for Thanksgiving and she had been to their home several times and she had never seen them argue or fight.

When asked if mother had made any progress during the year they had known each other, mother's AA sponsor responded: "Oh my gosh. When I first met [mother], I didn't think I would ever talk to her just from her language and the way she dressed. She just quit smoking. Every single thing she could possibly think of to change her way to be a wife and a mother, she—if anybody even suggests anything, then she's willing to take the steps to do it."

Regarding whether she knew about the facts leading to the dependency case, mother's sponsor testified: "We haven't really got that deep, but just her alcoholism and her learning that she truly is an alcoholic and changing all that and taking the steps towards that. I don't know a lot of her history with her and her children. I know a little bit about her ex-husband's abuse and about being reported and the phone calls being called in."

Mother's parenting class instructor, Susan Knopf, testified regarding mother's positive participation in and successful completion of the class and opined that mother was benefiting from services. Knopf further testified that S1 was old enough to

31.

participate in part of the class and Knopf observed that mother related to S1 in an appropriate manner.

Knopf acknowledged she was not aware of mother's referral history. As to the facts leading to the dependency case, Knopf testified: "I was just told certain things about drinking. That's all I got." She was not told anything about domestic violence.

Mother's current counselor, Josh Tracy, a marriage and family therapist, testified that since he started counseling mother in September 2014, they had met for a total of nine sessions. Tracy opined that mother had made progress in her primary goal in counseling which was to develop coping skills to handle anxiety. Tracy observed that during their last session on January 9, 2015, mother was "quite calm" and she did not exhibit "any form of anxiety."

Mother's husband, T.H., testified that, in his opinion, there was no risk of mother relapsing into using alcohol. But if the children were returned to him, or if he had the children for a visit, and he discovered mother was inebriated or had used alcohol, his response would be to take his children and leave and make sure they were not exposed to that behavior. He had also learned to avoid domestic violence and would not allow his children to see it.

Regarding the inappropriate Facebook posts in December 2014, T.H. testified that it had been his idea to post something on Facebook and that he now thought it had not been a good idea and he understood that it should not have been done because of confidentiality. He also understood about cooperating with the department and that it had not been a good idea to put his opinion about the department or the department's position on the Internet.

Dr. Alexandra Campbell, a clinical psychologist who provided therapy to mother based on the department's referral, testified that after mother's initial intake session on March 4, 2014, mother attended approximately 17 individual therapy sessions with her between April 2, and August 20, 2014, around the time Dr. Campbell stopped working

32.

with the department.  Dr. Campbell believed that counseling had helped mother and noticed improvement, particularly in the areas of mother's anxiety and difficulty sleeping.  Over time, mother also seemed to become more self-confident and willing to respond to Dr. Campbell's suggestions for change, such as the suggestion to dress more conservatively.

Asked whether mother's willingness to change applied to her attitude towards the use of alcohol, Dr. Campbell responded:

> "Yeah.  You know, she had been a bit reluctant in the beginning to really identify herself as an alcoholic.  I recall that we had a lot of discussions about her feeling that she clearly identified herself as a recovering drug addict.  In a way to her, alcohol was kind of subsumed under that general heading, so there was, you know, a little bit of resistance at first for a while on just using the specific term.  But over time, she did become, you know, more willing to admit that alcohol had been, you know, a specific problem and to identify herself as an alcoholic.  I believe she told me about, you know, one court appearance where she was able to acknowledge that."

Regarding her perception of mother's progress outside therapy and in the other services she was receiving, Dr. Campbell testified:

> "From what she would tell me about, of course, I would only have to go on the client's self-report.  She was, you know, very active in her 12-step recovery community and was, um, doing—I believe there may have been parenting classes and some others possibly.  I don't know if anger management was part of it.  But, you know, she would—she seemed very engaged and would report very positively, especially on her interaction in 12-step recovery."

Dr. Campbell further opined that mother's "getting out more and getting very involved [socially] with the 12-step meetings and other things" had helped contribute to her increase in self-confidence and reduction of anxiety symptoms.

When asked about whether she had been able to make any observations about mother's level of self-control or management of anger, Dr. Campbell testified:

> "Um, well, you know, without seeing her in the direct environment where those things might be an issue, it's hard to gauge exactly, um, because,

33.

again, I just have the client with me and you kind of rely on what they are telling you. But she would report that those areas were improving."

Regarding mother's ability to benefit from continuing reunification services, Dr. Campbell responded to questioning by mother's counsel, in pertinent part, as follows:

"Q.     And being familiar with the Case Plan and the objectives of the Case Plan, was it—is it your impression that at least as of August, that at that time she would benefit from further services—the whole panel of services that were offered by Child Welfare Services?

"A.     Well, I was never asked to really specifically make that kind of a determination. You know, I'm not an expert in that area. But at the time, yeah, I'm sure that's what I thought.

"Because, I mean, I would believe that most people who seem to be making the amount of effort that [mother] was, at least in our work, would continue to benefit. It would be rare that somebody wouldn't benefit at all probably in my opinion.

"Q.     And if a psychologist, based on standardized test results, whether it would be the MMPI [Minnesota Multiphasic Personality Inventory] or some other personality inventory or other testing results, determined that she would not benefit, would you agree with that conclusion?

"A.     Um, it's—you know, since I work with her directly personally for, you know, many weeks, I would probably rely more on my own opinion. I mean, so I don't know if I could say I would be expert enough to say, oh, I completely disagree, because I'm not an expert in sort of the whole area of child custody evaluations or anything. But my own impression would be that she would continue to benefit.

"Q.     And do you have—is there any reason why you would feel that she'll not benefit now from further services?

"A.     Well, I don't have any personal knowledge now, so I can't really speak to what's going on right now.

"Q.     Do you know of any reason that—

"A.     No.

"Q.     —[That] she would not benefit?

34.

"A.     No, I don't know of any."

Mother was the last witness to testify at the 12-month review hearing. At the beginning of direct examination by her counsel, she testified that she recalled the incident that led to her children's removal and that she was "fully aware" her decisions or choices contributed to that incident. Mother also confirmed that she felt alcohol was a problem in her life and identified October 10, 2013, as the last time she had had a drink of alcohol and October 11, 2013, as her "sobriety date." Since then, she had not consumed any alcoholic beverages.

Mother confirmed she used medical marijuana as recommended by a physician. She also took Klonopin daily for anxiety but was "actually taking less" than what she had been originally prescribed, explaining "I'm prescribed three a day just in case, but I've actually only needed two." Mother did not take any medications or street drugs that had not been prescribed to her.

When asked whether, at first, she was "resistant to the suggestions, say, in counseling or in the parenting class," mother responded, "[o]f course I was." Her attitude, however, had changed since then in that she became calmer and began to have a more positive outlook. She also learned to communicate the issues she had, not just with the social worker, but also with her husband. Mother described how she and T.H. made the decision to call Dot Patterson and voluntarily participate in Patterson's 12-week course which addressed domestic violence, anger management, and impulse control, which they paid for themselves.

Mother also participated in all the services that were recommended as part of her case plan and did so willingly, not begrudgingly. She was also a member of both AA and Al-Anon, and had served as secretary for both groups. Now she was the secretary of the AA group, which met twice per week, and T.H. was the secretary of the Al-Anon group, which met once per week. Asked why she had participated in so many 12-step meetings, mother testified:

"Um, I found once I got into recovery, I was very resistant. I didn't understand how alcohol had not just affected me, but how it's affected my family. It's—it's magical. It's like you go there and you walk out of the room and everybody is there because they have the same problem. They just want to stop. They don't ever want to pick up again."

Mother confirmed that participation in AA and Al-Anon had given her the tools to avoid using alcohol. If the children were returned to her that day or in the future, mother testified, she planned to continue with the 12-step programs and to abstain from drinking alcoholic beverages, even in moderation, because she had learned "you never pick up the first one and then you don't have to worry about the next."

Mother further testified that she had learned tools to avoid both verbal and physical domestic violence situations from her anger management class, which she completed in May 2014. When asked if parenting classes had also helped her in that regard, mother testified:

"Um, it helped me be more understanding of my older children's growth and their development. I mean, I had it nailed for the family and how they developed, but I've had eight children, so I was able to understand more about, like, why [S1] would be kind of seclusive [*sic*] in her room. It's not that she's mad or she's angry, but she just needs her alone time and her space.

"With [S2], she was twelve going on thirteen, and I was having struggles with her mouth, for lack of a better term. She was talking back and being rude and being mean. I learned that that was perfectly normal too. Just because [S1] didn't do it, [S2] was a completely different person."

Mother went on to confirm her participation in anger management and parenting classes, as well as in AA and Al-Anon, had helped her to learn the importance of not exposing the children to domestic violence situations or the use of alcohol. She also learned not to involve the children in her struggles with the department or with regard to the dependency case.

When next asked whether it was a mistake or whether she defended writing something on Facebook about the children and their being taken from the home, mother testified as follows:

"A.	I completely apologize for disrespecting the Court. I'm going to get that out now and CWS. But that was not the intent. The intent was a family Christmas card. When we asked the children what they wanted for Christmas, I was expecting, I want hot rods and race a track or I wan [*sic*] makeup or money or whatever. All they said is I wanted to go home. It just kind of broke my heart. They made their little poster thing and we took pictures and it was never intended to go onto Facebook. That was never ever my intention.

"Q.	When—when you say they 'wanted to go home,' does that mean to your home?

"A.	Yeah, yeah. They wanted to come home with us.

"Q.	So whose idea was it to make a sign or a poster?

"A.	Well, like I said, it was intended to make a family Christmas card that said Merry Christmas and then put the year on it. What ended up happening was the kids saying, all we want for Christmas is to go home. We took that picture and it ended up posted up and then I posted one and we all got in trouble.

"Q.	Was that sign your idea or the kids?

"A.	It wasn't—it wasn't an idea. It just happened. That's what I was trying to say.

"Q.	Well, who wrote the sign?

"A.	I didn't.

"Q.	Do you know who did?

"A.	I don't know who was writing the sign. We have six kids, so we're kind of all scattered in the library. There was a supervisor there. She might be able—she might be able to tell you.

"Q.	Okay. Did you put them up to it or dictate what the sign would say?

"A.    No.

"Q.    You're aware you've been ordered not to run anything on social media regarding this case or violate the confidentiality of the juvenile files?

"A.    I have not even posted a picture of their visits.

"Q.    And you said you intend to abide by that order?

"A.    Yes.

"Q.    Since that one incident, have you run anything in Facebook or any other social media in that regard?

"A.    No."

Mother's counsel next asked mother whether she felt she would benefit from further services if they were offered. Mother responded:

"If they were to offer more services, I don't know what more services they could offer to be beneficial. I think that I have completely and totally gone above and beyond what I could benefit from. I continue to benefit everyday through my programs that I work, but I don't really need a court order to do that. If they wanted to provide me and have me do that, I could do that. Yes, I will continue to benefit from them. It's kind of all in the eye of the beholder, because the—the way I feel is that, here, you did this and if you do this, we'll give you your kids back. Now that you've done this and if you do this, we'll give you your kids. Okay. Then I get here and they say, if you do this, then we'll give you your kids. Well, then I get here and I complete it and where's my kids? Oh, well, you don't get them now."

Mother went on to testify that there had not been any further incidents of domestic violence since the children had been detained. Regarding her husband, T.H., mother testified that they had learned through their coursework what triggered their arguments and "to walk away from one another instead of—instead of me never backing down or standing my ground or vice versa." She had also learned tools of communication and compromise and was able to control conflicts.

Mother did not think the children would be at risk of being exposed to new incidents of domestic violence in the home, explaining: "Most of the domestic violence

wasn't with [T.H.]" Mother further testified that the domestic violence was with her previous partner, J.C., that she had never had any physical altercations with T.H., and that she had managed to get a handle on the verbal conflicts.

Mother did not see any problem with the recommendation of T.H. receiving further services or any reason she would not also wish to participate in further services. Mother thought more services for them could only be helpful for them to learn more tools to become more capable of "just being calm and communicative and not holding resentments."

Regarding her children with J.C., mother confirmed that if those children were awarded temporarily or permanently to his custody and control, she would be willing to assist him and to engage in visitation so that they could still have a relationship with her. Mother added, however, that she hoped the court would recognize all her efforts and return all of the children to her home and she did not understand why the department was recommending they be placed with J.C. In this regard, mother testified:

> "[E]ven though I benefitted from every service they've offered me and improved my life in every possible way that I could, they want to put them with volatile men. Maybe I'm crazy, but I just don't understand. But then, again, I don't know how [J.C.] acts when I'm not around. You know, I don't—I know how he acts when he's around me. I know how that he's a danger to me."

Mother acknowledged that one of the criticisms against her was that she had been associating with J.C. and allowing him in her home, which had been detrimental to the children. Asked who she thought the aggressor had been in her disputes with J.C., mother testified as follows:

> "The aggressor, in my personal opinion, was [J.C.] I went to AA birthday night. I got home and got accused of sleeping with the person that drove me so, therefore, I felt that he had instigated the fight since it was my home. I lived in a gated community. He was not allowed in the gated community and he was there to offer his help in watching the kids while I went to AA.

39.

"When I got home, I was not expecting that. So when I stood my ground, I was on the deck and I had a shovel. I told [S2] to call 9-1-1 and to get in the house and lock the door. I stood on[] the deck in between me, him and the children. Because even—if he hurts me, that's one thing. He can hurt me all he wants, but I want to let him get to my children."

Mother next denied that she had threatened anyone with a shovel or with an axe during the incident.

During cross-examination by the children's counsel, mother gave the following answer when asked what she believed had been the cause of the incident with S2 prior to the children's removal:

"There's a lot of causes to that incident stemming up beforehand. We went—we went to CWS. From my … understanding, I was done with what they were requiring of me. On her birthday, I had to go to CNVC. As a result of what CPS wanted me to do, I had to file a restraining order against her father. Her birthday was October …. And on October 9th, she had her championship at [school]. [The social worker] went down there and talked with [S2] and had her in tears to where [mother's friend] had to pull [S2] away so she could play her basketball game. She came back that night third place in her basketball game and freaked out about my drinking and said I was an alcoholic. [The social worker] said I could not drink and that I had lied to her, but I didn't lie to her."

On redirect, mother responded to further questioning about the incident with S2 as follows:

"Q. Now, [S2] was upset, went ballistic because she thought that you shouldn't—you were ordered not to drink at all?

"A. Correct.

"Q. And so she was expressing herself about that?

"A. Yes.

"Q. And did that lead to an altercation between you and [S2]?

"A. Yes.

"Q. And did you intentionally hurt [S2]?

40.

"A.     No.

"Q.     Did she fall down accidentally?  What happened?

"A.     She didn't really fall down.  She threw herself to the ground.  She freaked out.  I don't know if it was the domestic violence.  I don't know if it was the restraining order.  I don't know if it was the basketball game or alcohol.  I don't know exactly what pinpointed her outbursts.  She threw herself to the ground and she started kicking at me.

"In the process of me trying to restrain her legs, she kicked me in the face and I swatted her on her butt twice.  I know you're not supposed to hit your kids.  I don't believe in hitting my kids, but I swatted her on the butt twice for being kicked in the face.  I said, why are you acting like this?  What happened?  What happened?  I'm going to let you cool down and I need a minute and I walked out the [door].  …I threw my hands in the air.  I went downstairs and went to [S1's].  I said, would you please go talk to your sister.  I don't understand what's going on with her.  I think she needs you.

"When I went back upstairs, I looked at [S1] and [S1] looked at me and [S2] had told [S1] that I had backhanded her.  That's all I know about the incident that may have been reported."

Mother's counsel next asked mother if, since the incident with S2, she had had any other altercations with S2 or any of the other children and this exchange followed:

"A.     [S2], yes.  I have had a couple of altercations.  One, being that she called and asked if she could pierce her nose at twelve years old and I told her no, absolutely no facial piercing.  Her father took her to pierce it anyways, so I tried to remove her phone from her for a week for—as punishment and the social worker came out and said that she wanted the phone and that [J.C.] paid the bill and I had to give up the phone.

"As close as the last three visits ago, I asked [S2]—I was trying to get her to look at me and to remove the sunglasses she was wearing.  It's like she's gotten so far and she knows she doesn't have to listen and there's no way for me to make her listen or punish her for anything.

"Q.     And do you think you have a bad relationship with [S2]?

"A.     No.  I don't think [S2] and I have a bad relationship.  I just think that we need to get into family counseling so that I can better understand what mood it is that she's going through, because the mental

41.

health disability that runs in our heritage could be passed onto my children such as [D.]'s special needs. She's a special needs child.

"[S2] could have a mental health issue where she could be a psychopath and you'd never even know. She's never been tested. She's never been tested for any mental health issues, so it's just a matter of her being a teen-age girl perfectly normal out lashing out and we just need to come together and find a way that we can communicate together."

After listening to the arguments of counsel, the juvenile court adopted the department's recommendations and explained its findings and orders, in pertinent part, as follows:

"Now we come to the issues related to [mother] and [T.H.] .… The question for [T.H.] is he is requesting that the children be returned to him today. And [sections] 361.5 … and 366.21 provide that at the 12-Month review, the Court must return the children to the home of the parents unless the Court finds that there would be a finding of detriment to the children to return them to the home.

"And in doing so, I have to take note of the fact that [T.H.] and [mother] are still living together and that would be to return them to that home. This case involves—we talked a lot about the use of the word chaos in a family. This Court has heard a whole bunch of hearings related to the family. In fact, I'll take judicial notice of that I was—I was the judge who heard the domestic violence application by [mother], she's referring to, so I heard all that evidence.

"…I'll take judicial notice of all [the department] reports. I reviewed all of those, so I'm really familiar with this family and the incident back in September [2013]. I would have been terrified to be there. I mean, it was horrific. Both [J.C.] and [mother] have fault in that. That domestic violence was perpetrated by both of them.

"But today what I heard from [mother] was that she still takes the position she was defending her children. Defending your children doesn't include taking a shovel and smashing out windows of trucks and knocking side view mirrors off of trucks. That was not defending your children. In fact, it was exposing the children to horrific violence. It was detrimental to the children. And I have absolutely no confidence whatsoever that if I was to return the children to [T.H.] or [mother], that we wouldn't—we wouldn't be back in that same position in weeks, if not months. I have no confidence in that at all.

42.

"I'm really concerned for these children. I do find that a return to [T.H.] at this time would be detrimental to the children. I find that return to the custody of [mother] would be detrimental to the children because of the level of violence that took place.

"In regard to [mother], her—her lack of insight into what caused that, that was evidenced today by her testimony on the witness stand.

"So I'm going to find that there is—it would be detrimental to the children to return them to the home at this time. I will concede—and I think the evidence is clear that [T.H.] has made progress, but it is not safe for the children to be returned at this time. So I am going to order—well, let me go on and talk about—since we're at the 12-month hearing, what the Court has to find here—one of the options, if the Court is not going to return the children at the 12-month permanency hearing, because the Court finds that there is still—it would be detrimental to the children to be returned to the home, is to continue the case for further services.

"It's the recommendation of the Department that I continue services for [T.H.] but not for [mother]. The Court can only continue the case if there's a substantial probability that the permanent plan of having the child returned and safely maintained in the physical custody of the parent will be achieved within the eighteen-month period. That's one. Or that Social Services has not provided.

"I will find that reasonable services have been offered to the parents. I think the evidence is clear and convincing and [mother's] counsel has conceded that point, so the question is, is there a reasonable probability or substantial probability—the language in the statute is, is there a substantial probability that the child can be returned to the parents and safely maintained in the home within the period of time—the eighteen months expires sometime in May is when it expires. That's when the eighteen-month review is set.

"In making that determination, the Court has to address these three issues: Whether, one, the parent has consistently and regularly contacted and visited with the children. I find that they have.

"Two, the parent or guardian has made significant progress in working on their plan and resolving the problems that led to the children's removal. As to [T.H.], I find that to be true based on the evidence that was presented.

43.

"And whether the parents ha[ve] shown the capacity and ability to complete his or her treatment plan, objectives and to provide for the children's safety, protection and physical and emotional well-being and special needs, by the eighteen-month review hearing, based on the evidence, I will find that [T.H.] does have the capacity and ability to complete the Treatment Plan within the period of time shown.

"So the question then becomes—and based on that, the Court is going to order that [T.H.] review, sign and comply with the Family Reunification Case Plan. So then comes the difficult question of whether or not the Court should order services for [mother]. And it's the same issues. Has she consistently and regularly contacted and visited the children. Yes, that's absolutely true. Has she made substantial or significant progress in working her Case Plan in resolving the problems that led to the children's removal? The burden here is on her to show that. The Court finds detriment to the children to return the children at this time. She's done—you know, the record is clear she's done everything that—that Social Services and Child Welfare Services have asked her to do. She's done all the AA meetings and she has done the parenting classes. The question is, has she gotten it? Does she have the insight into what caused the problems that led to the child's removal? Has she made significant progress in resolving those problems?

"Now, [mother's counsel] points out that there hasn't been any domestic violence. She has made substantial progress in terms of her alcoholism. I think it's at least a recognition, but, I mean, I have real issues even with her testimony today, you know. In her view, I've done everything they asked me to do and, therefore, I should get my kids back. It's—the missing piece is there is—she doesn't see how—what she did and the way she's looking at her life to this point and the effect it has on her kids and the trauma that these kids have been subject to. These poor children have lived a life that's been filled with trauma. The question is, will she be able to reunify within six months? Now, [mother's counsel] sort of, at this point, towed around with all the witnesses called by [mother], would she benefit? Would she continue to benefit from services? Sure, sure, she would continue to benefit.

"That's not—the issue before the Court is, is there a substantial probability that she's going to be able to safely parent these children by the eighteen-month review hearing? That's the issue. Has she made significant progress to prove to the Court that she would be able to safely parent? Even in her testimony today, you can see the defensiveness. You can see that when she was challenged on any kind of point, she became

44.

defensive. I mean, I don't know how many notes I made when she was answering questions from County Counsel that she started arguing with County Counsel about what she did.

"In the Court's view, while [mother] has made some progress, she has not made substantial progress or significant progress. And while [mother's counsel] says that the psychologists are trying to predict the future, that's exactly what the statute asks me to do, is to determine whether there is a substantial probability that she's going to be able to safely parent these children by the eighteenth-month review.

"What do I have to guide me in that? The evidence that was presented by the professional opinions of the objective psychologists and the—and the opinions of her friends and associates, one of whom was her close friend from childhood and clearly has a bias in favor of [mother] and the people that have known her for the period of time she's been involved in AA. She's, you know, a good participant in AA. And that may all well be true, but does it show that there's a substantial probability that she would be able to safely reunify with her children by the eighteenth-month review? I cannot answer that question affirmatively.

"The Court will find that Pursuant to 361.21, that at this time, that reunification services will be terminated to [mother]."

## *DISCUSSION*

### I. Substantial Evidence Supports the Juvenile Court's Detriment Finding.

Mother contends there was no substantial evidence to support the juvenile court's finding at the 12-month review hearing that return of the children to her custody would create a substantial risk of detriment to the children. We disagree.

#### A. *Applicable law*

"We start with the fundamental premise that the underlying purpose of dependency law is to protect the welfare and best interests of the dependent child." (*In re Luke M.* (2003) 107 Cal.App.4th 1412, 1424–1425.) "Although a parent's interest in the care, custody and companionship of a child is a liberty interest that may not be interfered with in the absence of a compelling state interest, the welfare of a child is a compelling state interest that a state has not only a right, but a duty, to protect." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307.) Thus, the focus is on the child, not the parent. "That is, once

45.

dependency jurisdiction is acquired because of the custodial parent's conduct, the court's inquiry shifts to a focus on the child's best interests, albeit with a preference towards parental reunification." (*Luke M.*, *supra*, 107 Cal.App.4th at p. 1425.)

Once a child has been removed from his or her parents' custody under section 361, the juvenile court is required to review the child's status every six months. (*In re Joseph B.* (1996) 42 Cal.App.4th 890, 897.) At the 12-month review hearing, the court must return the child to the parent's physical custody unless it finds, by a preponderance of the evidence that return "would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (f)(1).) The burden of establishing detriment belongs to the department. (*Ibid.*) "The failure of the parent … to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental." (§ 366.22, subd. (a)(1).)

We review the juvenile court's finding to see if substantial evidence supports it. (*Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 763.) In reviewing a challenge to the sufficiency of the evidence, we must draw all reasonable inferences in favor of the juvenile court's findings. (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400–1401.) We do not decide the credibility of the witnesses or resolve conflicts in the evidence. Those are matters exclusively within the province of the trier of fact. "If there is substantial evidence supporting the judgment, our duty ends and the judgment must not be disturbed." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545; see *Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 705 (["In the presence of substantial evidence, appellate justices are without the power to reweigh conflicting evidence and alter a dependency court determination"]).) On appeal, the parent has the burden of showing that there is no evidence of a sufficiently substantial nature to support the court's finding. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

**B.    Analysis**

In challenging the sufficiency of the evidence supporting the juvenile court's detriment finding, mother emphasizes the fact the children were removed after specific incidents of domestic violence and alcohol abuse occurring in September and October of 2013.  Because the department presented no evidence of her involvement in any *new* incidents of domestic violence or alcohol abuse occurring between that time and the time of the 12-month review hearing in late January and early February of 2015, and the juvenile court essentially acknowledged that mother had participated regularly in all the services required under her case plan, mother suggests the record not only lacks substantial evidence that she *currently* posed a risk of detriment to the children, but also affirmatively demonstrates she made substantive progress in her court-ordered services.  According to mother, the juvenile court improperly based its detriment finding "on the old domestic violence that occurred" and "on speculative, arbitrary and capricious formulations" rather than on "solid and credible evidence."  In addition, she construes certain comments of the juvenile court as showing it improperly shifted to her the burden of establishing the absence of detriment, and suggests the court could not properly rely on the statutory presumption of detriment contained in section 366.21, subdivision (f), because it found she had regularly participated in services.  Mother also complains that the juvenile court failed to consider each child individually in its analysis of the detriment issue.

Based on our careful review of the record and applicable law, we find none of these arguments to be persuasive and conclude there was ample evidence supporting the juvenile court's finding that returning the children to mother's custody at the time of the 12-month review hearing would create a substantial risk of detriment to them within the meaning of section 366.21, subdivision (f).

The juvenile court's comments, viewed in context and in their entirety, do not indicate the court relieved the department of its burden of proof on the detriment issue

47.

but show it duly considered the department's evidence and implicitly found that that evidence—particularly the expert opinions of Dr. Carmichael and Dr. Schmidt— established that, notwithstanding mother's regular participation in services and the absence of evidence of any new incidents of domestic violence or alcohol abuse, mother had failed to make substantive progress in her treatment programs and return of the children to her custody currently would create a substantial risk of detriment to them.

The psychologists provided detailed explanations, rooted in fact, as to how mother's persistent failure to acquire meaningful insight into how her behavior had directly led to the children's removal, despite her participation in over a years' worth of services ordinarily expected to lead to such insight, indicated she had not made (and was incapable of making by the time of the 18-month review hearing) sufficient progress in her treatment programs to make the lasting behavioral changes required to be able to parent the children safely and avoid relapsing into the same types of behavior which resulted in their removal from her custody. The experts' opinions in this regard constituted substantial evidence supporting the court's detriment finding, and mother's contrary arguments effectively invite this court to reweigh the evidence which, of course, we cannot do. (See *In re Zachary G.* (1999) 77 Cal.App.4th 799, 812.)

In any event, we find no merit in mother's claim that the expert opinions of Dr. Carmichael and Dr. Schmidt were speculative or conclusive compared to those of mother's witnesses because, in mother's words, "the psychological reports were based on tests which were *predictive of behavior*, rather than observation of *actual behavior*." (Italics added.) It is clear from the record that Dr. Carmichael and Dr. Schmidt based their opinions not only on the findings of the psychological testing they administered to mother, but also on their clinical interviews with her and their review of multiple sources of information, which included firsthand accounts of mother's actual behavior. The psychologists also explained how mother's reported behavior and her responses to

48.

questions during the clinical interviews were consistent with the findings of the psychological testing.

Mother has provided no persuasive argument for doubting that the experts' opinions constituted solid and credible evidence supporting the juvenile court's detriment finding. The fact the psychologists' opinions included predictions about mother's future behavior did not render them speculative or conclusory as their opinions were based on solid evidence and their qualifications to render such opinions was not only unchallenged but stipulated to by the parties below. Further, as the court rightly noted, it had a statutory duty to make predictions regarding mother's behavior and could, therefore, properly rely on the experts' opinions for guidance. The juvenile court here found the opinions of the independent experts to be more credible than those of mother's witnesses, which the court reasonably viewed as tending to reflect a bias in favor of mother.

To the extent mother holds up the favorable opinions of her former therapist, Dr. Campbell, to be superior to the departments' experts on the ground they were based on Dr. Campbell's observations of mother's actual behavior over a period of time, this characterization of Dr. Campbell's opinions is not supported by the record. Dr. Campbell qualified her own opinions regarding mother's progress and ability to benefit from further services by voluntarily admitting that her opinions in this regard were largely limited to what mother told her in therapy (i.e., "the client's self-report") and by pointing out she had never been formally asked to make an assessment and she was not "an expert in the area." Dr. Campbell similarly qualified her testimony that she would *probably* rely on her own opinion that mother would be able to benefit from continuing services over the contrary opinion of a psychologist, which was based on standardized psychological testing, by adding she did not know if she was "expert enough" to "completely disagree" with such an opinion because she was "not an expert in sort of the whole area of child custody evaluations .…"

Moreover, like the testimony of Dr. Campbell, the testimony of a number of mother's other witnesses reflected their opinions of mother were heavily influenced by what mother told them rather than on what they personally knew or had observed of her behavior, particularly her behavior vis-à-vis the children and the reasons for their removal from her custody. For example, mother's adult son was apparently unaware mother's alcohol use had been a factor in the children's removal, while her parenting class instructor was unaware that domestic violence had been involved. Mother's own AA sponsor of nearly a year admittedly knew little about mother's history with the children, and her testimony suggests that whatever information mother did provide was likely incomplete or inaccurate, and not unlike the unfounded account of the dependency proceedings asserted by mother in her December 2014 Facebook post, just a little over a month before the 12-month review hearing commenced.

Notwithstanding mother's evasive testimony regarding the genesis of the Facebook post, which contained derogatory statements about the department and a picture of the children staged during a supervised visit, it is clear from all the circumstances surrounding the incident, that mother deliberately used Facebook as a platform to complain about the department and promote one of her consistently inaccurate positions regarding the reasons for children's removal. In this regard, she falsely portrayed herself as the innocent mother doing everything she could to get her children back from an overzealous department that had unjustly removed them from her custody based on false allegations of abuse made against her by a vindictive and violent ex-husband.

As Dr. Schmidt opined, mother's behavior during the Facebook incident, which occurred close in time to the 12-month review hearing, constituted additional proof she continued to demonstrate a profound lack of insight into the reasons for her children's removal and provided further support for the experts' opinions that mother had failed to make substantive progress in her court-ordered services. Dr. Schmidt's opinion in this

50.

regard also contradicts mother's suggestion that the psychologists' opinions in this case did not adequately assess current circumstances but were exclusively based on old incidents. In any event, the experts' evaluations were not necessarily outdated simply because they were conducted in April and October of 2014, as the experts were specifically asked to evaluate mother's ability to benefit from services for a timeframe encompassing the 18-month review period, the findings of their evaluations remained consistent despite being conducted six months apart from each other, and were consistent with and supported by evidence of mother's more recent behavior, not to mention her own testimony at the 12-month review hearing.

Mother's own testimony supported the experts' opinions regarding her failure to gain any real insight into her problems with alcohol and domestic violence and how the dysfunctional behaviors those problems caused had directly contributed to the events leading to the children's removal. As noted by the juvenile court, despite complying with all her case plan requirements, and as seen in the Facebook incident just discussed, mother continued to assert factually inaccurate versions of those events. Thus, the court noted mother's testimony continued to minimize the significance of her own extremely violent behavior during the September 2013 incident, by misrepresenting it as an act of defending the children, despite all the evidence to the contrary considered by the court at previous hearings.

Mother's testimony similarly demonstrated her lack of insight into how her alcohol use had led to the children's removal. Despite her testimony claiming to be *fully aware* her choices had contributed to the incident, that claim was belied by her more detailed testimony regarding what she believed were the reasons for the October 2013 incident. Her testimony clearly showed she continued to hold to the position that S2 was the instigator of that incident, that S2 had essentially caused her own injuries and later exaggerated and/or lied about mother's conduct during the incident, and it was S2's reported account of the incident, not mother's own alcohol-fueled abuse, that caused the

department to intervene and remove the children from her custody. We see no recognition in mother's testimony of the harmful effects of her alcohol use on the children or the causal connection with their removal from her custody. Moreover, the substantial risk of detriment demonstrated by the evidence clearly applied to all six of her children and we find no basis to conclude the court failed to properly consider the risk of detriment as to each individual child.

We also disagree with mother that the juvenile court demonstrated an erroneous reliance on the statutory presumption of detriment in its comments regarding mother's failure to meet her burden of showing she had made substantial progress in working her case plan to resolve the problems that led to the children's removal. According to mother, once the court found she had participated regularly in the services offered to her, the court could not rely on the department's evidence that she had failed to make substantive progress to support its finding of detriment and shift the burden to her to prove otherwise. This argument fails.

When added to the Welfare and Institutions Code, and as amended through 1998, section 366.21, subdivision (f), read, in pertinent part: "The failure of the parent or legal guardian to participate regularly in court-ordered treatment programs shall be prima facie evidence that return would be detrimental." (Stats. 1987, ch. 1485, § 43, p. 5632; Stats. 1998, ch. 1056, §§ 15.1, 34, pp. 6483–6484, 6518.) In 1999, the Legislature amended section 366.21, subdivision (f), to provide (as it currently does), in pertinent part: "The failure of the parent or guardian to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental." (Stats. 1999, ch. 805, § 4, subd. (b), p. 4677 [Assem. Bill No. 740], giving effect and incorporating the amendments of section 366.21, subd. (f), by ch. 399 [Sen. Bill No. 1226], in the form set forth in ch. 805, § 2.2, p. 4670.)

The purpose of the 1999 amendment was to clarify "that the failure to make substantive progress in court-ordered treatment programs, regardless of regular

participation in such programs, shall be prima facie evidence that return of the child to the parent shall be detrimental to the child." (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 1226 (1999 Reg. Sess.) as proposed to be amended and as amended June 21, 1999, p. 1.) The author of Senate Bill No. 1226 explained:

> "This bill sends a message to parents that attendance in court[-]ordered programs is not enough—they need to learn how to correct their problems and learn proper parenting skills.... [M]ere 'participation' in court-ordered treatment programs does not necessarily mean that the parent is adequately addressing the problems that led to the abuse or neglect of the child and the court's order to remove the child from that parent's home for fear for the child's safety.... [T]his bill will give the juvenile dependency court greater authority to terminate parental rights and order a safe, permanent placement for a child, when the child's parent or guardian fails to comply with both the spirit and the letter of the court's order to seek needed treatment." (*Id.* at pp. 2–3.)

In effect, the amendment codified existing case law that a parent's compliance with "the reunification plan by attending the required therapy sessions and visiting the children is to be considered by the court; but it is not determinative. The court must also consider the parents' progress and their capacity to meet the objectives of the plan; otherwise the reasons for removing the children out-of-home will not have been ameliorated." (*In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1143.)

Consequently, the application of the presumption of detriment was not dependent upon evidence of mother's nonparticipation in services. Instead, the juvenile court could properly find that the presumption of detriment applied in the absence of any convincing evidence that mother had made substantive progress in meeting the objectives of her case plan requirements. In any event, even without the presumption, a finding of detriment is supported based upon the previously noted substantial evidence of mother's failure to make substantive progress in her court-ordered treatment programs despite her regular participation in such programs for well over a year.

**II.    Substantial Evidence Supports the Finding there was No Substantial Probability the Children Could Be Safely Returned to Mother by the Time of the 18-month Review Hearing.**

Mother next contends the trial court erred in terminating her reunification services because its finding that there was no substantial probability the children could safely be returned to her custody by the time of the 18-month review hearing was unsupported by substantial evidence. She also contends the court abused its discretion by terminating her services while continuing them to T.H. We reject both contentions.

The period for reunification services for a child over the age of three when removed from parental custody is limited to 12 months from the date the child entered foster care. (§ 361.5, subd. (a)(1).) However, services can be extended up to 18 months from the date of initial removal if the court finds there is a substantial probability the child will be returned and safely maintained in the parent's home during that time or if reasonable services were not provided. (§§ 361.5, subd. (a)(3), 366.21, subd. (g)(1).) In order to make the finding that the child can be safely returned to the parent, the court must find the parent regularly visited the child, has made significant progress in resolving the problems that led to removal, and has demonstrated the capacity and ability to complete the plan and provide for the child's safety and well-being. (§ 366.21, subd. (g)(1)(A)–(C).)

For all the reasons discussed above, although the record contained substantial evidence establishing that mother regularly visited the children, the record also disclosed substantial evidence establishing that she both failed to make significant progress in addressing her problems and lacked the ability to meet the objectives of her case plan. The juvenile court properly terminated mother's reunification services.

We also see no abuse of discretion in the court's termination of reunification services. While acknowledging that case law held it permissible for a juvenile court to terminate services to one parent while continuing to offer them to the other, she argues those cases involved situations that were "vastly different" than those here. Mother

argues that, in light of evidence she was bonded with and would remain an active part of the children's lives, "continuing reunification services would have been in the children's best interests." The problem with mother's argument is that it assumes further services would have been fruitful and there is ample evidence to the contrary. No abuse of discretion appears on the record.

**III.  Mother Forfeited her Claim that the Failure to Proceed as if the Children Were Indian Children under California Rules of Court, rule 5.482(c), Requires Reversal of the Judgment.**

Lastly, mother contends the judgment must be reversed based on the juvenile court's failure to proceed as if the children were Indian Children pursuant to California Rules of Court, rule 5.482(c) (hereafter rule 5.482(c)). We conclude mother forfeited this issue by failing to raise it below.

Rule 5.482(c) provides: "If after notice has been provided as required by federal and state law a tribe responds indicating that the child is eligible for membership if certain steps are followed, the court must proceed *as if* the child is an Indian child and direct the appropriate individual or agency to provide to provide active efforts under rule 5.484(c) to secure membership for the child." (Italics added.)

It is undisputed that letters from the Chickasaw Nation responding to the department's Indian Child Welfare Act (ICWA), 25 U.S.C. §§ 1901–1963, notices indicated that, although not currently recognized as members, the children were eligible for membership in the Chickasaw Nation, through their maternal great grandfather, upon completion of an application for a Certificate of Degree of Indian Blood (CDIB) and submission of birth and death certificates establishing lineal descent. Thus, the social worker gave mother a CDIB application and, after mother indicated she lacked all the required documentation, directed mother to complete the application if she was able to obtain that documentation. It is unclear from the record why mother thereafter failed to complete the application or was unable to procure the necessary documentation. At the

12-month review hearing, the juvenile court found that ICWA did not apply as to any of the children and mother raised no objections challenging that finding.

Mother now asserts "[i]t is clear that merely giving the mother the form and leaving it to her to complete and order the birth certificates is not active efforts" and that rule 5.482(c) requires reversal and remand for the juvenile court to make the required ICWA findings and require the department to make active efforts to secure the children's membership in the Chickasaw Nation.

The children were not Indian children within the meaning of ICWA because it was insufficient for them simply to be eligible for membership. They must be either members or the children of a *member* of the tribe to be Indian children. Neither the children nor their parents are enrolled, and thus are not members of the Chickasaw Nation. (*In re Jose C.* (2007) 155 Cal.App.4th 844, 849; 25 U.S.C. § 1903(4); § 224.1, subd. (a) [applies the federal definition of Indian child]; § 224, subd. (c) [tribe must determine minor eligible for membership *and* the biological child of a member for ICWA to apply].) The juvenile court was thus correct that ICWA did not apply. Rule 5.482(c), however, goes beyond ICWA to include *potential* Indian children within its provisions pending the tribe's adjudication of membership. (Compare *In re Jose C.*, *supra*, 155 Cal.App.4th at p. 849 & fn. 2 [predating rule 5.482(c), finding that nothing in ICWA or California statutes gives juvenile court authority to require minor's enrollment in tribe].)[4]

While a tribe's right under ICWA to notice of dependency proceedings is not subject to forfeiture as a result of a parent's inaction (*In re Jennifer A.* (2002) 103 Cal.App.4th 692, 707; *In re Kahlen W.* (1991) 233 Cal.App.3d 1414, 1425), the same is not true of other procedural ICWA provisions. (*Jennifer A.*, *supra*, 103 Cal.App.4th at pp. 707–708; *In re Riva M.* (1991) 235 Cal.App.3d 403, 412 [burden of proof and need

---

[4]    As noted by the parties, the validity of rule 5.482(c), along with the validity of California Rules of Court, rule 5.484(c), is currently pending review by the California Supreme Court in *In re Abbigail A.* (2014) 226 Cal.App.4th 1450, review granted September 10, 2014, S220187.

for expert testimony].)  These other procedural ICWA provisions relating to the burden of proof and need for expert testimony are nevertheless subject to a rule requiring a showing that a waiver of them is knowing and voluntary.  (*Jennifer A.*, *supra*, 103 Cal.App.4th at p. 708 [declining to find such requirement under case law]; Cal. Rules of Court, rule 5.484(a)(2).)  That rule, however, does not include the failure to object to a court's failure to direct an agency to take steps to secure a child's membership in a tribe under rule 5.482(c).  We decline to add a requirement of obtaining a knowing and voluntary waiver to that rule as a matter of judicial fiat where the drafters did not include any such provision.  We thus find that mother has forfeited this issue on appeal.

## DISPOSITION

The orders of the juvenile court are affirmed.


_____

HILL, P.J.

WE CONCUR:


_____

LEVY, J.


_____

PEÑA, J.